**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE #: 7:23-MJ-07071-KPB |
| | ) | |
| v. | ) | HON. KIM P. BERG |
| | ) | |
| ANTHONY BIANCHI | ) | **AFFIDAVIT OF ANTHONY J. BIANCHI** |

State of New York

County of Orange

The undersigned affiant, Anthony J. Bianchi, being duly sworn, hereby deposes and says:

1.  To my knowledge, all of the facts stated in this affidavit are true and correct.

2.  I am over 18 years of age. I reside at 118A Washington Road, West Point, New York 10996 (the "Home"). I am fully competent to make this affidavit and I have personal knowledge of the facts stated in this affidavit.

3.  I rent the Home from West Point Housing LLC, as owner of the subject premises, acting through its authorized agent, Balfour Beatty Military Housing Management LLC, a division of Balfour Beatty PLC, a global infrastructure firm based in the United Kingdom, which manages housing for residents living at the federal military reservation at West Point, New York.

4.  I reside at the Home with my wife, Julie, and my two daughters: Alaina, who is ten years old, and Alyssa, who is nineteen years old.

5. I am currently serving as a Colonel in the U.S. Army, assigned to the United States Military Academy at West Point, New York ("USMA"). Until recently, I served as the Garrison Commander ("GC") of U.S. Army Garrison at West Point, New York ("USAG West Point") from July 2022 until August 2023. I am a 1997 graduate of USMA, commanded at multiple levels throughout the U.S. Army during my successful 25+-year career, and have deployed as a field artillery officer in support of Operation Enduring Freedom (Afghanistan) and Operation Iraqi Freedom (Iraq).

6. On July 23, 2023, at approximately 12:30 a.m., I was driving my official Government vehicle, bearing my official Garrison Commander placard and official license plates, headed north on Thayer Road approaching the interior Thayer Access Control Point gate ("Thayer Gate"). Mr. Robert Rodenmayer, a 1997 USMA graduate and classmate, was in the passenger seat of the vehicle.

7. While approaching Thayer Gate, which has two entry lanes, I noticed a vehicle stopped in the right entry lane undergoing a search by military police. A military police vehicle was parked behind the vehicle subject to the search. There were at least two military police undertaking the search of that vehicle.

8. I pulled my vehicle into the left entry lane at Thayer Gate and stopped parallel to the parked military police vehicle about a car length in front of the guard shack housing the on-duty security guard.

9. While stopped at Thayer gate, I lowered my passenger-side window and called to the military police officers on scene to approach my vehicle. One of the military police officers approached

my vehicle and put his head into the passenger-side window. We then had a brief (20 to 30 second) conversation about how they were doing and if they needed any assistance with the search. It was common practice for me as the GC when I came through the security gates to stop my vehicle to have a discussion with any of the military police personnel, being that they were soldiers under my command. The military police officer then tapped on the roof of my vehicle and told me to "have a great night". At that time, I raised the passenger-side window and proceeded slowly toward the guard shack.

10. Since I had already stopped about a car length from the guard shack, was driving my Government vehicle with official license plates and official GC placard on the windshield, had already interacted with a military police officer who clearly knew who I was, and had seen the security guard watch my interaction with the military police officer, I assumed it was fine for me to slowly proceed through the checkpoint without stopping to have my ID scanned. As I passed slowly through the check point, I tapped my breaks and pointed to my official Garrison Commander placard. The on-duty security guard made a hand gesture, which I interpreted as an indication to continue to proceed through the checkpoint, which I did.

11. Typically, when driving an official Government vehicle, bearing official plates and an official government placard on the windshield, the security guards commonly would not stop my vehicle or require me to show my ID. This had happened hundreds of times, at all of the security gates located at USAG West Point while I served as GC. Early in my command, I would commonly attempt to show my ID, but the security guards would tell me that it was not necessary for me to show my ID while driving a Government vehicle with my GC placard as they all recognized me as the GC. My official command photo – along with the official

command photos of all other key leaders at USMA – is posted at every security gate. As a result, I felt my actions were appropriate and sufficient to allow me to safely proceed through the security checkpoint.

12. I then proceeded to the stop sign located at the intersection of Thayer Road and Mills Road and stopped my vehicle at the stop sign. After stopping at the stop sign, I proceeded to drive to my Home, approximately two miles from Thayer Gate, and arrived at my Home at approximately 12:45 a.m.

13. The Thayer Gate security video will confirm my actions as described above. I never evidenced any intent to evade the security guard at Thayer Gate or failed to follow normal procedure. Neither military police nor security personnel attempted to stop or interrupt my progress or pursue me as I negotiated Thayer Gate and drove home. Additionally, neither military police nor security personnel engaged the electronic barrier that is located approximately 100 feet beyond Thayer Gate. If there were any indication that I had "run" the security gate or posed a risk to the installation, there would have been ample opportunity for the on-duty security guard to activate the barrier. Finally, driving the approximately 2-mile distance from Thayer Gate to my Home normally takes approximately six to seven minutes, abiding by all stop signs and following the posted 15 and 25 mph speed limits, providing ample opportunity for the military police to pull me over prior to arriving at my Home.

14. After arriving at my Home, I entered through the back door and then took my dog for a short walk around the Home, exiting through the front door. I then re-entered my Home through the front door approximately five minutes later. I then spent approximately 40 minutes with my classmate Robert Rodenmayer, who was staying with me for the evening, getting settled into

the Home. I went to sleep in my master bedroom on the 2nd floor of the Home at approximately 1:30 a.m. At no time during this period did I observe any military police in the area of my Home.

15. I was awoken at approximately 2:45 a.m. by knocking on my bedroom door. I would like to note that I fell asleep wearing hearing aids in both of my ears, which are prescribed by my physician to counter hearing loss due to my service in the field artillery branch of the U.S. Army. The hearing aids are Bluetooth connected to my cellular phone, and I normally play calming music to mask my tinnitus to fall asleep. As a result, I was unaware of any attempts to awaken me, until I heard the knocking on my bedroom door.

16. I opened the bedroom door and found Command Sergeant Major Michel R. Fraser ("CSM Fraser") and Deputy Garrison Commander Erik Mitchell ("DGC Mitchell") standing outside the door. CSM Fraser and DGC Mitchell worked directly with me in my role as GC, and I considered them trusted colleagues. CSM Fraser did most of the talking. She told me that the military police were outside the Home, and I needed to come outside with her to talk to the military police about my "running" the security gate. I then proceeded to question for several minutes why the military police thought I had "run" the gate. CSM Fraser said she did not know the details, but I should get dressed and go outside to discuss the matter with the military police. DGC Mitchell further told me that it would be best if I cooperated and went outside to speak with the military police. At that point I did not believe that I could remain within my Home, so I willingly cooperated and followed their instructions.

17. I then proceeded to get dressed, and CSM Fraser and DGC Mitchell brought me outside of the Home, where we were met by three to four military police officers, the Director of Emergency

Services Lieutenant Colonel Miguel Sanchez, and Provost Marshal Major Gary Beaumont. One of the military police officers told me that I needed to go with them to the military police station. I told him I would ride with CSM Fraser and meet them at the station. However, the military police officer said I needed to travel in their military police vehicle. The military police officer then placed me in the back seat of the military police vehicle and drove me to the military police station at approximately 2:55 a.m. – more than two hours after any military police officer or security guard had observed me driving a vehicle. My rights were not read to me until approximately 3:50 a.m. – almost one hour after I was apprehended. At no time after I was placed in the military police vehicle at my Home did, I ever feel that I had the right or the opportunity to leave of my own free will.

_____
Anthony J. Bianchi

Sworn to before me this
28th day of December, 2023

John L. Buckheit
Notary Public of the State of New York
No.: 02BU5044290
Qualified in Orange County
Commission Expires May 31, 2027